**UNITED STATES BANKRUTPCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re:                                    :    **Chapter 11**
                                          :
**PACIFIC DRILLING S.A.,** *et al.***,**       :    **Case No. 17-13193 (MEW)**
                                          :
            **Debtors.**                  :    **(Jointly Administered)**
-----------------------------------------------------------x

### BENCH DECISION REGARDING MOTION FOR APPROVAL OF TERMS OF EQUITY RIGHTS OFFERING AND EQUITY COMMITMENT AGREEMENT

A P P E A R A N C E S :

For the Debtors:
    TOGUT, SEGAL & SEGAL LLP
    One Penn Plaza
    New York, NY 10119
        BY:  ALBERT TOGUT
            KYLE J. ORTIZ

For Quantum Pacific:
    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    Four Times Square
    New York, NY 10036
        BY:  JAY M. GOFFMAN
            GEORGE R. HOWARD

For the Ad Hoc Group of Bondholders:
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
    1285 Avenue of the Americas
    New York, NY 10019
        BY:  ANDREW N. ROSENBERG

For the RCF Group:
    WHITE & CASE LLP
    1221 Avenue of the Americas
    New York, NY 10020
        BY:  CHARLES R. KOSTER

For Citibank as RCF Agent:
    SHEARMAN & STERLING LLP
    599 Lexington Avenue
    New York, NY 10022
        BY:  NED SCHODEK

1

For Samsung Heavy Industries Co. Ltd.:
    DLA PIPER LLP
    120 North Market Street, Suite 2100
    Wilmington, DE 19801
      BY:  R. CRAIG MARTIN

For the Office of the United States Trustee:
    UNITED STATES DEPARTMENT OF JUSTICE
    201 Varick Street, Room 1006
    New York, NY 10014
      BY:  BENJAMIN J. HIGGINS

For the SSCF Agent:
    MILBANK, TWEED, HADLEY & MCCLOY LLP
    28 Liberty Street
    New York, NY 10005
      BY:  MATTHEW BROD

For Credit Suisse:
    CRAVATH, SWAINE & MOORE LLP
    Worldwide Plaza
    625 Eighth Avenue
    New York, NY 10019
      BY:  PAUL H. ZUMBRO

Proposed Counsel for the Official Committee of Unsecured Creditors:
    BRINKMAN PORTILLO RONK APC
    4333 Park Terrace Drive, #205
    Westlake Village, CA 91361
      BY:  DAREN BRINKMAN
          LAURA PORTILLO

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

This is the final version of a bench decision that the Court announced in open court on

September 25, 2018.

Before me is the Debtors' motion for approval of the terms under which additional equity

capital will be raised in connection with the proposed plan of reorganization.  I will not keep

everybody in suspense:  I am going to approve the arrangements, but not without a great deal of misgivings, which I am going to explain.

The proposed arrangements were negotiated during the course of a mediation supervised by former Judge Peck.  The participants in the mediation included certain holders of fully secured obligations, a separate ad hoc group of holders of three classes of secured debts that apparently are undersecured, and Quantum Pacific, the majority equity owner, which I shall refer to as "QP."

As originally proposed in early August, the structure was similar to one that has become increasingly common in Chapter 11 cases.  More particularly, the proposal called for $400 million to be raised through a rights offering.  The opportunity to participate in the rights offering would be provided only to holders of the three classes of undersecured debts.  Those holders would be given the opportunity to buy common stock at a 46.9 percent discount to the stipulated and expected value of that equity under the plan.

In addition, the proposal called for a private placement of $100 million pursuant to which the so-called Ad Hoc Group would have the exclusive right to buy additional stock, which would be sold for $100 million but at the same 46.9 percent discount to expected plan value.

The Ad Hoc Group also proposed to provide a backstop under which the Ad Hoc Group guaranteed its own purchases of stock and under which the Ad Hoc Group would have the exclusive right to buy any shares that other eligible holders did not subscribe to purchase pursuant to the rights offering.  The backstop would ensure that the full $500 million would be raised under the various equity sales, and in exchange the proposal called for a backstop fee equal to 8 percent of the amount of stock to be issued pursuant to the offering, payable in common stock.  Eight percent of $500 million is $40 million but since the eight percent fee was

3

to be payable in the form of a percentage of the steeply discounted stock to be issued, the fee

actually had an expected value of much greater than $40 million.

When this proposed structure was first before the Court early August, it was met with

strong opposition from QP, which had its own proposal that it wanted to make.  The QP proposal

also contemplated a $500 million equity raise but it differed from the Ad Hoc Group proposal in

at least three ways.  First, the proposed backstop fee would be 7 percent rather than 8 percent.

Second, the backstop premium would be available to any creditor participating in the rights

offering who committed to make a purchase on or before an early election deadline that was to

be established, but that was not described any further in the papers that I received.  Third, QP

proposed a $100 million private placement in which it, not the Ad Hoc Group, would be the

buyer, but it proposed a slightly higher buy-in price than was proposed in the Ad Hoc Group

proposal.

I raised questions about the proposals on August 9 and expressed some skepticism about

the structure and the fees.  I asked if the Debtors had explored the option of raising equity in the

markets and whether the Debtors had done their homework, so to speak, as to whether better

terms might be available in the market.  The answer at that time in so many words was that the

Debtors had not done so.  The Debtors have offered different explanations since then as to why

they agreed to this structure, but at least on August 9th the answer essentially was that this was

being proposed because it raised the amount of money the Debtors wanted and it was the

structure that the Ad Hoc Group wanted.

I also asked why the private placements were being set aside either for the Ad Hoc Group

(under its proposal) or for QP (under its proposal); why there was a need for a backstop at all,

since the parties in front of me seem to be fighting for the chance to buy the equity at the

4

proposed discounted price; and why such a large backstop fee of eight percent was needed in light of the fact that equity was to be sold at a very large 46.9 percent discount to expected value.

I did not get answers at that time that were very specific or very satisfactory, though in fairness to the parties, the structure had just been agreed to and was not actually before me for approval on that date. I noted on August 9th that rights offering structures like this can be a proper and useful way of raising financing, and that backstop fees can be appropriate when real risks are taken and when the fees are proportionate to those risks, but that like every other tool that has been invented they can be misused.

The theory of the Bankruptcy Code is that when the big creditors sit in a room and negotiate a deal, the little creditors who are in the same boat get the same deal. The Bankruptcy Code does not permit the unequal treatment of creditors in the same class; it also does not permit the payment of extra compensation to large creditors in exchange for their commitment to vote for a plan. The problem with special allocations in rights offerings, or with private placements that are limited to the bigger creditors who sat at the negotiating table, or big backstop fees that are paid to the bigger creditors who sat at the negotiating table but that are not even open to other creditors (and in particular to other creditors in the same class), is that it is far too easy for the people who sit at the negotiating table to use those tools primarily to take for themselves a bigger recovery than smaller creditors in the same classes will get. The Code allows for reasonable financing terms but they must be reasonable, and they cannot just be a disguised means of giving bigger creditors a preferential recovery. I therefore made clear that to the extent that these terms were being presented to me as reasonable financing terms, the parties would need to convince me that the terms were reasonable as a financing matter and were better than other options.

After the August 9th hearing, the parties returned to mediation, and since that time they have resolved their differences.  The size of the proposed rights offering was changed to $350 million.  In addition to the proposed $100 million private placement for the Ad Hoc Group, the parties proposed a separate $50 million private placement to QP on the same terms.  The proposed backstop arrangement remained the same:  the Ad Hoc Group would be paid an eight percent fee, payable on stock, with respect to the entire $500 million offering.  The parties also entered into a Plan Support Agreement, which as I have noted previously, has not been presented for my approval and which contains some terms that I have previously said I would not approve.

Last week, on September 18th, the parties appeared before me with their request for approval of the backstop fees and rights offering procedures.  I heard evidence in the form of the testimony of Mr. Celentano of Evercore, the Debtor's investment banker.  At the conclusion of the hearing, I made a few rulings.

First, I ruled that no legitimate justification had been offered for the proposed separate private placement to the Ad Hoc Group.  I noted that the terms were to be the same as the proposed terms under the rights offering, and that in substance, if not in form, the proposed private placement was just a way of giving the Ad Hoc Group a disproportionate share of the rights offering.  Counsel to the Ad Hoc Group agreed that the private placement would be eliminated and that the shares that would have been covered by the private placement to the Ad Hoc Group would instead be part of the rights offering for which all holders would be eligible.

Second, I ruled last week that the Debtors had failed to show the reasonableness of the proposed backstop fee, or the need for it in certain instances.  During the hearing, the Debtors pointed to other bankruptcy cases in which large backstop fees have been paid.  But Mr. Celentano readily acknowledged that he could think of no out-of-bankruptcy market context in

which people who are being given the exclusive opportunity to buy stock at an expected 46.9

percent discount were nevertheless also paid an eight percent fee in exchange for their

willingness to take advantage of that golden opportunity.  In addition, Mr. Celentano

acknowledged that even in prior bankruptcy cases there were few instances, if any, in which

equity was offered at so steep a discount and in which parties nevertheless were paid such a high

fee as the eight percent fee that was being proposed.

Some prior decisions have justified backstop fees by reference to put options since the

backstop includes a commitment to buy at a fixed price no matter what the real value turns out to

be.  But there are several flaws in that analogy.

First, in most of the cases where these structures have been proposed the equity is offered

at a steep discount to expected value.  In this case, for example, the proposed discount is 46.9

percent.  That means that the put option is very much out of the money.  The more out of the

money a put option is, the less the premium that it ought to command.

Second, there are features to the typical backstop arrangement that are far different from

a typical put option.  In a straight put option, the seller of the option takes the risk that it will

have to buy the security if prices fall below the exercise price.  But if prices stay above the

exercise price, then the option will not be exercised.  In that case, the seller of the put option gets

nothing except the right to retain the option premium, and the option premium is paid in

exchange for the risk that the price might fall.

In this case, though, and in other bankruptcy cases where similar structures have been

proposed, the party who provides the backstop also is being given an exclusive right to buy at a

discount.  In other words, the backstop provider does not merely take the risk of a lower price.

Instead, the backstop party also gets the benefit of the expected discount.  That is more akin to

being given a call option.  It is a right that has additional value that ought to be valued and taken into account in determining, as a reasonable financing matter, whether a backstop fee is needed at all, or what a reasonable backstop fee should be.

Here, the evidence that I received last week did not suggest that a backstop fee was needed or proper.  I ruled after considering the evidence that the eight percent fee could be paid with respect to shares for which no commitments were yet in place, but that the fee had not been justified as a financing matter as to other portions of the proposed offering, including those to which QP and other creditors had committed and to which the Ad Hoc Group itself had committed.  However, I also scheduled this further hearing today in case the parties wished to present additional evidence.

In advance of this hearing the parties have submitted a revised proposal that eliminates the proposed private placement to the Ad Hoc Group and that provides that $460 million of equity will be raised to a rights offering in which all members of the three impaired secured classes will be entitled to participate.  They have also proposed that the Ad Hoc Group be paid a backstop fee equal to 8 percent of the uncommitted portions of the equity offering and 5 percent as to the rest.  Again, that fee would be payable in stock.  The parties have submitted an additional brief and an additional declaration that emphasizes the benefits to the Debtors of having obtained committed equity financing, and that repeats arguments that were previously made regarding the risks that allegedly are involved in providing the backstop.  Mr. Celentano has also provided additional evidence as to not only fees approved in other bankruptcy cases but regarding committed underwriting fees that have been paid in a number of out-of-bankruptcy financings.

I have considered the additional evidence that has been provided and the revised terms of the proposed arrangements.  As I said at the outset of my remarks here, I have misgivings.  I have misgivings mainly because I am not completely satisfied with the evidence that I have as to the reasonableness of the proposed fee.  There are tools that investment bankers and securities professionals use to calculate option values.  There are option formulas that take account of how the exercise price compares to the current value (which in this case would be the expected plan value) and that take account of potential market volatility.  As a general matter, the higher the market volatility, the higher the option value.  In this case, the parties have made many submissions in which they have trumpeted the risks that oil prices might decline, but nobody has made any effort to calculate the actual degree of risk involved here, or to calculate the actual value of the put option portion of the backstop fee, or to calculate just how volatile the markets would have to be in order to justify an option fee of the size that has been proposed, given how out-of-the-money the put option would be.

I have been provided with evidence of committed underwriting fees that have been charged in cases outside bankruptcy.  It is true, as the Debtors suggest, that in those cases the commitments usually were made only a few days before the sales of the relevant securities, and that significantly reduced the risks to the parties providing the commitments.  But it is also the case that the prices to which the parties committed themselves in those instances were much closer to the expected values, as opposed to the steep 46.9 percent discounts that are being offered here.

I have also been given evidence of backstop fees that courts have approved in some other bankruptcy cases, but many of those were uncontested, and nobody has pointed me to any prior decision in which a court has approved these fees with any actual discussion of the evidence as

to the economic reasonableness of a particular backstop fee, or as to how the reasonableness of such a fee should properly be evaluated.

The parties have also urged me to approve the eight percent fee in reliance on the Debtors' business judgment. But in considering such arguments courts should not lose sight of the fact that these fees are typically payable in stock. As a result, they have no practical effect on the Debtors themselves. The real effect is on other creditors, because the issue of the added shares dilutes the value of the shares that those other creditors will receive.

Furthermore, the principle to be guarded here is one that requires equal treatment of similarly situated creditors, which is more a matter of bankruptcy philosophy than it is a matter of business judgment. As I said last week, as a business matter the Debtors just want to get out of bankruptcy. They can agree to reasonable fees as part of a financing, but it is for the courts to decide whether fees are reasonable or not and to decide whether, in effect, some larger creditors are really being given an unequal and preferential treatment that is disguised as a financing term.

I cannot help but continue to be skeptical based on the evidence I have as to the proposed backstop fee and the alleged need for it in this case. That is particularly true as to the Ad Hoc Group's own commitments to exercise their rights in the rights offering. They have ample economic incentive to exercise those rights and, in fact, participated in structuring those rights to make them attractive to themselves. They have already committed to exercise their rights as part of a Plan Support Agreement with other parties. I am concerned that nobody else was given a similar opportunity, which raises the possibility again that the backstop fee is really just an extra payment and an extra recovery rather than a reasonable, stand-alone financing term.

But, on the other hand, while I have expressed my own concerns many times over the past several weeks in the hearings on this matter, not one of the relevant indenture trustees and

not a single holder of any of the relative debts has come forward to complain about the proposed

terms.  Instead, the Debtors and all of the other parties have in unison asked me to approve these

revised arrangements.

I may be skeptical about what the evidence would show if objections were filed.  I hope

that in the future when these structures are presented, the parties will explore in more detail the

issues and concerns that I have raised.  But this is the wrong case in which to make rulings,

particularly based only on skepticism.  I have to rule on the evidence that is actually before me.

While I have strong doubts, those doubts are not enough, without more and without any

objections, for me to reject the terms that the parties have negotiated and for which they have

sought approval today.  So I will approve the revised arrangements that have been presented.

Dated:  October 1, 2018
          New York, New York

s/Michael E. Wiles
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE